[Civ. No. 2085. Fourth Appellate District.—September 1, 1939.]

JOSEPHINE VITRANO et al., Appellants, v. WESTGATE SEA PRODUCTS COMPANY (a Corporation), Respondent.

A. T. Procopio for Appellants.

Wright, Monroe, Harden & Thomas for Respondent.

BARNARD, P. J.—This is an action to recover damages for the death of one Dominic Vitrano, the husband and father, respectively, of the plaintiffs. This appeal is from a judgment based upon a directed verdict in favor of the defendants.

The deceased met his death by falling into a vat of boiling water while assisting in the process of "tanning" a fishing net. He was a member of a crew of a boat used in commercial fishing. All of the fish caught from this boat were regularly sold and delivered to the respondent corporation. It appears from the evidence that the fishing nets used by such crews require "tanning" at intervals, approximately once a month. The purpose of this process was to remove the slime which accumulates upon the nets. In this process the fishermen would put ground tan-bark into a vat and fill it with water. Steam was then turned on and the mixture boiled several hours, after which the nets were placed in the solution.

The vat here in question was about 12 feet long, 6 feet wide and 4½ feet high. Along each of its two long sides there was a plank or platform about 35 inches below the top of the vat, upon which the fishermen were supposed to stand while they lowered the nets into the solution within the vat.

This vat was constructed by the respondent and stood near its fish cannery, where it had been in use for four years. It was furnished as an added inducement to commercial fishermen who regularly delivered their fish to this cannery. No charge was made to such persons for its use. Water and steam were furnished without charge and conveyed to the vat through pipes. The fishermen furnished their own tan-bark. A fisherman desiring to use the vat would apply to an employee of the respondent and be assigned a time when it was not being used by others. At the appointed time the fisherman would, by means of valves at the vat, turn on water and steam and after cooking the mixture turn off the steam. Employees of the respondent took no part in the tanning process but had on occasions repaired the pipes and vat when leaks developed therein. After using the vat it was the custom of the fishermen to remove their nets and leave the old

water and tan-bark in the vat for the next user to clean out the debris. Ordinarily, the next user would draw off the water and shovel the debris over the two sides of the vat. Sometimes there would be very little of this debris around the vat, and at other times it would be piled up almost level with the top of the vat. At times the fishermen would clear away some of the debris and at times some nurserymen had taken some of the debris away to use as a fertilizer. On one or two occasions the respondent had removed some of the debris and used it to spread over the road for the purpose of laying the dust.

The accident here in question occurred at 3 o'clock in the afternoon of a clear day. The water was boiling and steam was rising from the water although the steam had been turned off. The only conflict in the evidence is as to whether the old debris had been shoveled out on that day before preparing a new mixture. The captain of the crew of which the deceased was a member testified that they left the debris at the bottom of the tank and added new tan-bark. There is evidence that he had previously told others that the debris was shoveled out before the new mixture was prepared. In any event, he testified that on that occasion the debris was piled high around the tank but that they paid no attention to it. The evidence is that it completely covered the platform on which the men were supposed to stand and was piled to within six or twelve inches of the top of the vat, that the debris was dry on top but wet and slippery underneath, and that the men proceeded to get upon the piles of debris and pull the heavy net into the vat. The deceased was on top of the pile of debris assisting in getting the net into the vat when he slipped and fell headlong into the water. One of the members of the crew testified "As we commenced to tan the net Mr. Joe gave him (the deceased) one end of the net and he had this end of the net in his hand and he was trying to place himself solid." Again he testified: "He was trying to place himself in good position and while he was doing that he slipped and fell into the water." The deceased had been a member of this crew for about fourteen months, during which he had assisted in the tanning process on about twelve different occasions.

For the purpose of this opinion it may be assumed that the deceased was an invitee upon these premises. The

rule is well established that in such a case the owner of the premises is not an insurer but that he owes a duty of ordinary care to see that the premises are reasonably safe. (*Shanley* v. *American Olive Co.*, 185 Cal. 552 [197 Pac. 793].) Among other things, the invitor is under the obligation to warn the invitee of any dangers of which he has knowledge and which are not readily apparent to the eye. There is no such duty where the dangers are obvious or as well known to the invitee as to the owner of the premises. (*Mautino* v. *Sutter Hospital Assn.*, 211 Cal. 556 [296 Pac. 76].) There is no obligation to give warning of an obvious danger or one which should have been perceived by the invitee through the ordinary use of his own senses. (*Ambrose* v. *Allen*, 113 Cal. App. 107 [298 Pac. 169].) In *Blodgett* v. *B. H. Dyas Co.*, 4 Cal. (2d) 511 [50 Pac. (2d) 801], it is said: " 'The owner of property, insofar as an invitee is concerned, is not an insurer of safety but must use reasonable care to keep his premises in a reasonably safe condition and give warning of latent or concealed perils. He is not liable for injury to an invitee resulting from a danger which was obvious or should have been observed in the exercise of reasonable care.' "

The motion for a directed verdict was granted in this case upon the grounds that the dangerous condition prevailing here was obvious to the deceased, was just as apparent to him as it could have been to the respondent, that the evidence was not sufficient to establish negligence on the part of the respondent, and that the same evidence necessarily disclosed contributory negligence on the part of the deceased.

The appellants rely upon such cases as *Meindersee* v. *Meyers*, 188 Cal. 498 [205 Pac. 1078], and *Hayward* v. *Downer*, 65 Cal. App. 450 [224 Pac. 265], where it was held that although the injured party had knowledge or means of knowledge of the danger a question of fact existed as to whether a want of ordinary care was disclosed by the failure to keep the danger in mind at the time of the injury. In the cases cited, while there was some knowledge of the existence of a temporary excavation which had been left without any attempt at protection or warning, the injury occurred at night, the obstruction was in a normally used path, and it would have been more or less reasonable for the injured party to forget either its existence or its exact location.

Under the existing circumstances, it was held that the question of whether reasonable care had been exercised was one upon which the minds of reasonable persons might well differ.

The instant case falls more nearly within the rules applied in *Weddle* v. *Heath,* 211 Cal. 445 [295 Pac. 832]. It is true that there is here no admission that the danger to which the deceased was exposed was obvious to him. The platforms built for the purpose of giving the men a place to stand while dipping the nets were at a height which would not only enable the men to place the nets in the vat but which would prevent the possibility of their slipping and falling into the vat. The injury in question resulted not from the way in which the vat was built but from a condition which had been brought about by the various invitees in allowing the debris to accumulate to the extent that it not only covered the platforms but was piled up to within a few inches of the top of the vat. It would necessarily be apparent to any reasonable man that it would be dangerous to work upon a pile of loose material with his feet only a few inches below the top of a vat containing boiling water, when he was required to use his hands in handling and pulling a heavy object. The evidence is that while the debris was dry on top it was wet and slippery underneath. The deceased was familiar with the work in which he was engaged and it was daylight on a clear day. The deceased knew that the vat contained boiling water and beyond any possibility of a doubt he saw and knew that the debris was piled up to within a few inches of the top of the vat.

Not only do the general circumstances rather conclusively show that the danger inherent to the situation should have been seen by the deceased and was known to him, but there is some direct evidence that such was the situation. One of the men assisting the deceased in this work testified that immediately before the accident the deceased was "trying to place himself solid" and that while "he was trying to place himself in good position" he slipped and fell into the water. Not only does this evidence show that the deceased was in a position where he found it necessary to make an active attempt to secure a foothold which would enable him to do his work, but it discloses an obvious difficulty and danger in so doing. This difficulty must have been clearly apparent to the deceased, for he was attempting to meet it. The fact

that he was having difficulty in getting a footing on such a pile of debris was in itself a warning of danger, when he was trying to stand thereon at a point where his feet were almost even with the top of the vat full of boiling water, and where there was nothing to cling to in the event he slipped and fell. Instead of taking steps to have the debris removed, a comparatively small task, he proceeded in disregard of the existing condition. It can hardly be said that reasonable minds might differ with respect to whether an obvious danger existed, or whether the deceased exercised ordinary care in disregarding a situation which was readily apparent to anyone, and with which he was already having difficulty. The fact that the danger in question was an obvious one is almost admitted by appellant's counsel. In his opening brief, he says:

"The Decedent, while performing his respective duty in the tanbarking of the nets on the date in question, climbed upon the side of the tanbarking vat which, as aforesaid, had been banked with tanbarking debris which had been allowed to accumulate, and attempted to secure a sure footing on the side of the vat and on the platform on which he had been accustomed to stand. *The platform being covered with tanbarking debris, naturally could not be used by the Decedent with safety.* The Decedent, while in the process of attempting to secure a sure footing on the side of the vat fell into the hot, boiling water which was in the tank and was killed." (Italics ours.)

The danger being as obvious to the deceased as it could have been to the respondent, we think the evidence fails to show negligence on the part of the respondent in failing to warn the deceased of the danger and, as was said in *Weddle* v. *Heath, supra,* "On the same facts it necessarily follows that the plaintiff was guilty of contributory negligence."

The judgment is affirmed.

Griffin, J., and Marks, J., concurred.